IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2009

## STATE OF TENNESSEE v. BRANDON JOHNSON

**Direct Appeal from the Criminal Court for Shelby County
No. 07-01964     W. Otis Higgs, Jr., Judge**

—————————

**No. W2007-01655-CCA-R3-CD  - Filed July 17, 2009**

—————————

The defendant, Brandon Johnson, was convicted by a Shelby County jury of first degree felony murder and second degree murder for shooting a man to death during an attempted robbery. The trial court merged the second degree murder conviction into the felony murder conviction, for which the defendant received a life sentence. In a timely appeal to this court, the defendant raises the following issues: (1) whether the trial court erred in denying his motion to suppress his statement to police; (2) whether the trial court erred in granting the State's motion for a sequestered jury; (3) whether the evidence was sufficient to sustain the convictions; and (4) whether the cumulative effect of the various alleged errors deprived him of his constitutional rights to a fair trial. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, District Public Defender; Phyllis Aluko (on appeal) and Robert Felkner and Kindle Nance (at trial), Assistant Public Defenders, for the appellant, Brandon Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Ray Lepone and David Pritchard, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case arises out of the March 10, 2003, shooting death of Richard McCuin at the hands of the defendant, who admitted in a statement to police that he was responsible for the victim's death but claimed that the shooting occurred in self-defense when he went to retrieve cash and property that the victim had stolen from him.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress his statement on the grounds that he lacked the mental capacity to make a knowing and intelligent waiver of his Miranda rights. At the suppression hearing, Sergeant Kenneth Shackleford of the Memphis Police Department testified that he was assigned to the homicide bureau in 2003 and participated in the March 12, 2003 interview with the defendant. He said that a uniformed police officer brought the defendant into the homicide office for the interview, where Sergeant Tim Sims read him his rights from the advice of rights form. The defendant appeared "very alert," told the officers that he understood his rights, signed the advice of rights form, and then gave the statement, which he initialed and signed. The defendant responded directly and coherently to their questions, provided detail in his narrative account of the crime, and did not appear to be confused by the questions or unsure of his responses. In addition, his account of the crime was consistent with the evidence the officers had in the case.

On cross-examination, Sergeant Shackleford testified that the advice of rights form and the written statement reflected that the defendant was informed of his rights at 2:20 p.m., signed the advice of rights form at 2:21 p.m, and signed and initialed the typewritten statement at 3:34 p.m. He acknowledged that the defendant told them that he could not read very well and said that was the reason that Sergeant Paula Harris read the defendant's statement aloud to him after it had been transcribed. He further acknowledged that they did not ask the defendant to explain his rights to them in his own words and that no one noticed, at the time, that the defendant's last name was incorrectly typed as "Jackson" at the top of the statement. On redirect examination, he testified that Sergeant Harris re-read the defendant's Miranda rights to him before he signed and dated the statement.

Dr. Fred Steinberg, an expert in the field of forensic psychology, testified that he prepared a report on the defendant based on his interview and psychological testing of the defendant as well as his review of discovery, which included the defendant's school records. He said that the defendant's full scale I.Q. scores from the age of nine though the present consistently fell below 70, which placed him within the mild mental retardation range. In addition, the defendant's achievement tests revealed that he had never moved beyond the second grade reading level and that his listening comprehension score was at the second grade, fifth month level.

Dr. Steinberg testified that he had analyzed the advice of rights warnings read to the defendant using the "Flesh Kincade [sic] Readability Index" and determined that the Miranda warnings fell at the fourth grade, eighth month level. He, therefore, believed that there were elements of the Miranda rights, as they were read to the defendant at the March 12 interview, which the defendant had not been able to understand. For example, when he asked the defendant what the phrase "[y]ou have the right to remain silent" meant, the defendant replied, "I don't know. Break it down. I don't know. Be quiet." The defendant also expressed confusion about the meanings of the words "advice" and "coercion" and appeared to overlook the important concept that anything he said could be used against him. In sum, Dr. Steinberg opined that the defendant was capable of

-2-

understanding the rights contained in the <u>Miranda</u> warnings, but that in order to do so, the rights would have to be explained to him in a manner "[m]ore consistent with his verbal ability."

On cross-examination, Dr. Steinberg testified that he did not consider the defendant's extensive juvenile criminal record, which included eleven prior custodial arrests, in his determination of whether the defendant had been able to comprehend the <u>Miranda</u> warnings at the March 12 interview because there was no record of how the rights had been explained to him in the past. He acknowledged that the defendant had a full scale I.Q. of 68 and a verbal I.Q. of 69 and was possibly malingering when he questioned him about his understanding of the phrases contained in the <u>Miranda</u> warnings. Finally, he conceded that he had not realized that the word "coercion" was not part of the <u>Miranda</u> warnings.

Dr. John Hutson, the State's expert forensic psychologist, testified that he had reviewed Dr. Steinberg's report, as well as the defendant's psychiatric, school, and juvenile criminal records, and disagreed with Dr. Steinberg's opinion with respect to whether the defendant understood his rights at the March 12, 2003, interview. He had no problem with the defendant's classification as borderline mentally retarded based on his I.Q. scores. He said, however, that much of Dr. Steinberg's extensive report, including his assessment of the defendant's reading skills, was not germane to the issue of whether the defendant could comprehend rights that were read to him. Based on his review of the records, including the defendant's responses to the officers' questions and his extensive juvenile record, he opined that the defendant had understood his rights at the March 12 interview. On cross-examination, he acknowledged that he did not know how the <u>Miranda</u> warnings had been explained to the defendant in his prior juvenile contacts with the Memphis Police Department. However, he believed that with the exception of the word "attorney," the <u>Miranda</u> warnings were couched in language that the average six or seven-year-old child could understand.

At the conclusion of the hearing, the trial court found that under the totality of the circumstances, which included the defendant's responses to the officers' questions, detailed statement, and extensive experience with the criminal justice system, his waiver of rights was knowing, intelligent and voluntary. Accordingly, the court overruled the defendant's motion to suppress his statement.

**Trial**

Troy Clay, the victim's brother, testified that the victim died on March 11, 2003.

Stephen Liggons testified that the victim had fathered a child with Liggons' younger sister, Shalita Jordan, and on March 10, 2003, was living with Jordan, their child, and Liggons' and Jordan's mother, Cynthia Watson, at Watson's Memphis apartment. At approximately 10:30 p.m. that day, Liggons was talking on a payphone located five or six feet from his mother's apartment when the defendant approached and asked if he knew "Little Buck." Although he knew that the victim's nickname was "Little Buck," Liggons initially feigned ignorance because something about the defendant aroused his suspicions. The defendant then asked whether he had a sister who lived

in the apartment and, when he answered in the affirmative, inquired, "[D]oesn't your sister have a baby by a guy named Little Buck?"

Liggons testified that Watson came to the door of the apartment at that point, and he informed her that the defendant was looking for the victim. Watson allowed the defendant inside, and two or three minutes later, Liggons heard a gunshot from the apartment. Almost simultaneously, a blue Ford Thunderbird pulled up outside the apartment, and men whom Liggons recognized as associates of the defendant's emerged from the vehicle armed with guns. Watson then came running out of the apartment saying that the defendant had just shot the victim. Two minutes later, Jordan came out of the apartment and said, "He just shot [the victim]. He just shot [the victim]." The defendant came out of the apartment immediately behind Jordan, looked to the right and left, approached the passenger side of the blue Thunderbird as if about to get inside, and then went into the home of a woman named "Flip."

Liggons testified that after the defendant left, he entered his mother's apartment and found the victim lying on the floor with a gunshot wound to the chest. On March 11, 2003, he identified the defendant from a photographic array and gave an official statement to the police. He did not, however, tell the police that the defendant had fled to Flip's home because he feared for the safety of his family.

Cythnia Watson testified that she heard her son talking to someone outside and opened her apartment door to encounter the defendant, who told her that he was looking for the victim, whom he claimed was his brother. She said she let him in to the front room of the apartment, which had a direct line of sight to the bedroom where the victim was resting with Jordan and their baby. The victim, who was dressed in boxer shorts and lying on a mattress on the floor, raised up and, when he saw the defendant, said, "Oh, what's up dog pound?" The defendant responded by asking if he could talk to the victim, and the victim told him he would not talk to him there but would meet him outside. At that point, Watson went outside to talk to her son for a moment.

When Watson returned to the apartment, the defendant was in the bedroom standing on the mattress and the victim was standing in the doorway with his hands raised over his head. Watson testified that she heard the victim plead for his life, saying, "Please don't kill me because I've got a baby in the house." She also heard the defendant ask the victim where the money was and the victim reply that he had no money. The defendant then shot the victim. Afterwards, the defendant picked up the victim's pants from the floor and went through the pockets but found nothing other than a Medicaid card. During that time, Watson grabbed her grandchild from the room and fled the apartment. Watson testified that the victim still had his hands raised in the air and had not made any moves toward the defendant at the time the defendant shot him.

Shalita Jordan testified that she and the victim were lying down in the bedroom with their infant son when the defendant came in and asked the victim if he could talk to him for a minute. She said that the victim answered "no" and said, "Do what you do when you see me in the street." The victim then jumped up, stood against the wall, and said, "Don't do it in front of [the] baby." Jordan

stated that the defendant pulled a gun out and twice asked the victim where the money was. Both times the victim answered that he had no money. The defendant then shot the victim, causing him to fall to the floor, before picking up the victim's pants and going through the pockets.

Jordan testified that the defendant next placed his gun against her head and asked her where the money was. She said that she initially told him that she did not know but then said it was outside. He directed her to take him to the money, and she led him to the front door of the apartment and pointed down the sidewalk. He started in the direction she had indicated, and she retreated into the apartment and shut and locked the door. Jordan testified that the victim was unarmed and had not made any aggressive moves toward the defendant at the time the defendant shot him. She further testified that she had no knowledge of the victim's having robbed the defendant earlier that day and knew nothing about any money.

Officer David Galloway of the Memphis Police Department's Crime Scene Unit identified the photographs he had taken of the crime scene early on the morning of March 11, 2003.

Dr. Teresa Campbell, the forensic pathologist who performed the autopsy of the victim's body, testified that the cause of death was a gunshot wound in which the bullet entered at his right upper abdomen, passed through his liver, perforated his aorta, and came to rest in the soft tissues and muscles of his back. She said that the victim was 66 inches tall and weighed 159 pounds and that his blood tested negative for the presence of drugs and alcohol.

The State's final witness was Sergeant Kenneth Shackleford of the Memphis Police Department, who described his interview with the defendant and identified the defendant's statement, which reads in pertinent part:

> About two three [sic] weeks ago I got jumped by [the victim] and three of his partners. They took my money and my rocks. So I [sic] night I did it[.] I had seen him go in one of the houses, but I didn't know what house he went in. So I asked somebody who knew and they told me. Me and a dude name Twone went to the door. I knocked on the door they open the door and I asked for [the victim] and the lady let me in. I told him let me holla at him outside and he was like what you need to holla at me for. So I kept asking him let me holla at him outside. Then he told the lady, that let me in, show this weak ass nigga to the door. Why [sic] we were talking I was standing in the hallway and when he said that I went in the room w[h]ere he was. He jumped up and when he got up, he grabbed me. I pushed him up off me, turn my head, and shot him. I kept asking his girlfriend where the shit at. She was like I don't know. So I flip over the bed, grabbed his pants, and checked his pants. It wasn't nothing in his pants so his girl start screaming and I ran out. Then I seen Roderick when I was coming out of the apartments and I asked him to drop me off down the street. He was taking to[o] long so I ran down there myself. And he called and was like where the gun at? I told him where the gun was at and he came and got it.

The twenty-two-year-old defendant testified that the victim and two companions, one of whom was armed with a gun, stole $200 in cash and two $25 rocks of crack cocaine from him on March 10, 2003, the day of the shooting. He explained that he did not report the robbery to the police because he was a drug dealer, but instead went to the victim's apartment because he believed he could "talk to him and get [his] money back." His description of his encounter with the victim at the apartment was consistent with his statement to police. Specifically, he stated that the victim jumped him the moment he entered the room and that he pulled out his gun, turned his head to see who was behind him, and shot. The defendant denied that he intended to kill or rob the victim and repeated that he went to the victim's apartment to talk to him. He said he had a gun with him because he lived in a dangerous neighborhood. He also said that he told the police in his March 12 statement that the victim had robbed him two or three days previously, but the information was not transcribed accurately.

On cross-examination, the defendant testified that had he intended to rob the victim, he would have drawn his gun upon entering the house. He stated that he pulled the gun out because he did not know how else to react when the victim grabbed him. He acknowledged that the victim was unarmed and that he had pushed him off him before he fired the shot, but he claimed that everything happened in an instant and that the shooting was an accident. Finally, he stated that he pointed the gun at Jordan "to get her scared enough to tell [him] where [his] money was."

## ANALYSIS

### I. Denial of Motion to Suppress

As his first issue, the defendant contends that the trial court erred by denying his motion to suppress his statement to police. The defendant argues that his statement should have been suppressed because his mental retardation, combined with the officers' failure to explain the Miranda warnings in simple terms he could understand, rendered him incapable of making a knowing and intelligent waiver of his rights. In support, he cites Dr. Steinberg's testimony about his limited reading and listening comprehension skills and the fact that the Miranda warnings, as they were read to him, were calculated to be at the fourth grade, eighth month level. The defendant contends that his prior experiences with the Miranda warnings cannot compensate for his intellectual deficits because there was no proof presented as to how the warnings had previously been administered to him in juvenile court. In his reply brief, the defendant further contends that there was no actual proof presented that he was provided with Miranda warnings during his juvenile arrests, but instead only the unsworn statements of the prosecutor, who characterized the defendant's eleven arrests as "approximately thirteen prior contacts with the criminal justice system and in eleven of those taken into custody by the Memphis Police Department where he was read his Miranda rights."

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the

"strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)). The waiver must be "'made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994)).

A defendant's mental retardation is but one of a number of different factors to be considered in the determination of whether the waiver of Miranda rights was knowing and voluntary. In Blackstock, 19 S.W.3d at 208, our supreme court observed:

Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] waive, the constitutional rights embraced in the Miranda rubric." Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

Id. (footnote omitted). The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

The trial court's extensive ruling states in pertinent part:

I find, frankly, that this young man understood the Miranda warning based on the totality of circumstances. I don't find that any threats exist or any coercion. I

think, clearly, that he demonstrated an understanding that he didn't have to say anything if he didn't want to. And that's basically what this whole thing is about.

. . . .

This young man here, in spite of all that I've seen here about his intelligence level, if you read his statement, he knows how to communicate -- he knows how to relate his experiences. He knows how to understand. And his answers to these questions, in my judgment, fall short of the standard necessary for this court to determine that he did not understand his rights.

The totality of the circumstances supports the trial court's findings that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights. The defendant's lengthy juvenile record, regardless of the manner or number of times in which he was advised of his Miranda warnings, reflects his extensive prior experience with the criminal justice system. In addition, Sergeant Shackleford testified that the defendant gave direct and coherent responses to the officers' questions, indicated that he understood his rights, and evidenced no confusion or hesitation in his responses or in his detailed narrative of the crime. Finally, Dr. Hutson, while acknowledging the defendant's borderline mental retardation, disagreed with Dr. Steinberg's opinion that the defendant would not have been able to understand the Miranda warnings at they were read to him.

On this latter point, we note that Dr. Steinberg based his conclusion that the defendant would have been unable to understand the rights on having run the Miranda warnings through the "Flesh Kincade [sic] Readibility Index," and determining that they included concepts that required a fourth grade, eighth month reading level. Later in his testimony, however, he acknowledged that he had mistakenly believed that the word "coercion" was part of the Miranda warnings, which calls into question the reliability of the "readability index" score he obtained. Moreover, as Dr. Hutson noted in his testimony, the defendant's reading skills were not at issue in a case in which he was not required to read the rights himself but instead had them read aloud to him. Accordingly, we conclude that the trial court did not err in denying the defendant's motion to suppress his statement.

## II. Sequestration of Jury

The defendant next contends that the trial court erred by granting the State's motion for a sequestered jury. He argues that the trial court erroneously believed that it had no discretion in the matter and that it failed to take into consideration the defendant's concern that the jurors might infer from their sequestration that he posed a physical threat to them. The State responds by arguing that the trial court clearly considered a number of factors in its decision and acted within its discretion in granting the motion. The State further argues that the defendant has not shown that he was prejudiced by the court's decision to sequester the jury.

Tennessee Code Annotated section 40-18-116 provides that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound

discretion of the trial judge[.]"  The prosecutor in this case, while acknowledging that the decision rested solely within the discretion of the trial court, argued that the jurors should be sequestered "out of an abundance of precaution," citing, among other things, the seriousness of the charges, the fact the killing occurred "in an apartment complex with numerous citizens around," and the potential publicity surrounding the case.  The trial court agreed, ruling as follows:

> Well, as a factual matter in a murder in the first degree case, when one party request[s] sequestration the Court grants it.  It is a very serious case, to say the least.  A lot of different factors involved in sequestering a jury in a murder case.  But, I am going to overrule the defense's motion and sequester the jury, out of an abundance of precaution and any number of factors that I can consider in a serious case like this.

> I am not going to do a lot of elaborating on it.  I just think that it is better to sequester the jury on a murder first degree case.

The defendant interprets the trial court's initial statement above as an indication that the court believed it had no discretion in the matter.  We believe, however, that the court was simply stating that its established practice was always to grant a sequestered jury whenever requested in a first degree murder case.  Although the court did not elaborate on the additional factors that led it to order sequestration, we note that the record reflects that the defendant was by his own admission a member of a gang.  The defendant's statement was redacted to prevent the jury from knowing of his gang affiliation, but, given that the record reflects that the "gang unit" was prosecuting the case, the trial court was almost certainly aware of the defendant's status as a gang member at the time it granted the State's motion to sequester the jury.  We, therefore, agree with the State that the trial court properly acted within its discretion in sequestering the jury.  The defendant is not entitled to relief on the basis of this issue.

### III.  Sufficiency of the Evidence

As his next issue, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to prove beyond a reasonable doubt that he had the requisite *mens rea* for either felony or second degree murder.  In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d

620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the conviction for felony murder, the State had to prove beyond a reasonable doubt that the defendant killed the victim during an attempt to perpetrate a robbery. See Tenn. Code Ann. § 39-13-202(a)(2) (2006). The mental state required for the conviction was the defendant's intent to commit the underlying offense, which in this case was "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. §§ 39-13-202(b), 39-13-401(a). To sustain the conviction for second degree murder, the State had to prove beyond a reasonable doubt that the defendant committed a knowing killing of the victim. See id. § 39-13-210(a)(1).

The defendant asserts that "[t]he facts . . . suggest that [he] . . . went to the victim's house to talk him into returning [his] property[,]" and that the shooting was a "reflex triggered by fear." Relying on his version of the events, he argues that the State failed to prove either that he had the intent to rob the victim or knowingly committed the shooting. However, when viewed in the light most favorable to the State rather than the defendant, the evidence established that the defendant had the intent to rob the victim and knowingly committed the shooting. The State presented two eyewitnesses to the crime who described the defendant's pulling a gun on the victim, demanding money, and then shooting the victim when he said he had no money. Both the eyewitnesses testified that the unarmed, semi-dressed victim had made no aggressive moves toward the defendant at the time of the shooting and that the defendant went through the victim's pants pockets after the shooting. In addition, the defendant admitted in his statement to police that he went to the victim's apartment to try to retrieve his property while armed with a gun, that he shot the unarmed victim during the attempt, and that he placed a gun to the victim's girlfriend's head after the shooting in an

effort to scare her into telling him where the money was.  We conclude, therefore, that the evidence was more than sufficient to sustain his convictions for felony and second degree murder.

## IV.  Cumulative Effect of Alleged Errors

Finally, the defendant contends that the cumulative effect of the various alleged errors deprived him of his state and federal constitutional rights to a fair trial.  Having found no errors, we conclude that the defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE